# STATE OF MICHIGAN

# COURT OF APPEALS

NORTHWOODS MANUFACTURING, INC.,

      Plaintiff-Appellee,

v

GREG LINSMEYER, JEFFREY PEARSON, and
NIAGARA FABRICATION, INC.,

      Defendants-Appellants,

and

JEFFREY WOLLER,

      Defendant.

UNPUBLISHED
May 24, 2016

No. 326551
Dickinson Circuit Court
LC No. 12-017234-CB

Before: GLEICHER, P.J., and SAWYER and M. J. KELLY, JJ.

PER CURIAM.

Defendants Greg Linsmeyer, Jeffrey Pearson, and Niagara Fabrication, Inc., appeal as of right from a judgment entered in favor of plaintiff Northwoods Manufacturing, Inc., following a bench trial in this case involving breach of fiduciary duty, conversion, and conspiracy. We affirm.

## I. FACTS

Defendants argue that the trial court erred by finding that defendants Linsmeyer and Pearson owed a fiduciary duty to Northwoods. They also raise several arguments relating to the trial court's award of damages for breach of fiduciary duty and conversion. This Court reviews a trial court's findings of fact for clear error and reviews its conclusions of law de novo. See *Chapdelane v Sochocki*, 247 Mich App 167, 169; 635 NW2d 339 (2001). "A finding is clearly erroneous if there is no evidentiary support for it or if this Court is left with a definite and firm conviction that a mistake has been made." *Chelsea Investment Group LLC v Chelsea*, 288 Mich App 239, 255; 792 NW2d 281 (2010). The existence of a legal duty is a question of law. *Oja v Kin*, 229 Mich App 184, 187; 581 NW2d 739 (1998).

Northwoods Manufacturing, Inc., is a metal fabrication company that was formed by Jonathan Pipp in 1994. Northwoods fabricates parts at its facility that range in size from small

-1-

brackets to large hydraulic tanks weighing in the tens of thousands of pounds. Pipp set up a limited liability company, KHP, to purchase a building to lease space to Northwoods for assembly of larger products and to provide rental space for other tenants. When Pipp semi-retired and began spending significant amounts of time in Florida in 2007, Linsmeyer was elevated to vice president and general manager of the company. Pipp turned over the day-to-day operations of the company to Linsmeyer in 2008 and gave him authority to make decisions and purchases on behalf of the company. Pearson, who had previously worked with Linsmeyer at a different company, was Northwoods' sales manager.

Le-Q, a company owned by Timothy Quick and a subcontractor to Northwoods, leased space in the KHP building to assemble ovens for International Thermal Systems (ITS) that were too large to be assembled at Le-Q's own facility. Le-Q did not have the manpower to handle all of the work for ITS, and so introduced ITS to Northwoods in the summer of 2010. Northwoods began performing a substantial amount of work for ITS in the fall of that year.

In April 2011, Linsmeyer and Pearson purchased a building in Niagara, Wisconsin. Sometime in early 2011, Quick asked Linsmeyer about continuing to lease space at Northwoods but, according to Quick, Linsmeyer told him that space was not available. Pipp testified, however, that he had told Linsmeyer that Le-Q could continue to lease space because Pipp wanted to keep Le-Q on site to ensure continuing business with ITS. According to Quick, Linsmeyer indicated that he had a building that was being refurbished as a fabrication shop and Le-Q could lease space in the building. Le-Q moved into the Niagara building as a tenant sometime between April and June 2011. Quick purchased a 20 percent share of the building in 2012 and became partners with Linsmeyer, Pearson, and Mike Collins. Le-Q was folded into Niagara Fabrication and continued to operate in name only.

Linsmeyer moved three Northwoods' projects—the Kuttner project, the ITS oven project, and the SGI hopper project—to the Niagara building for completion. Pipp knew that Linsmeyer had purchased a building for the purpose of leasing space to tenants, and believed that the Northwoods projects were being completed at the Niagara building with labor performed by Northwoods' employees. Pipp did not know that Linsmeyer and Pearson were operating a fabrication business or that Niagara Fabrication had employees working on Northwoods' projects. Pipp discovered the existence of Niagara Fabrication in May 2012 and terminated Linsmeyer's employment. Pearson resigned shortly thereafter. Pipp subsequently learned Linsmeyer and Pearson were quoting bids on behalf of Niagara Fabrication for Northwoods' customers, that Linsmeyer and Pearson had developed a business plan to operate their own fabrication business while employed at Northwoods, and that Linsmeyer was using Northwoods' credit accounts to purchase items for the benefit of Niagara Fabrication. Northwoods sued, alleging that Linsmeyer and Pearson breached their fiduciary duties and converted Northwoods' property.[1]

---

[1] Northwoods also alleged that Woller conspired with Linsmeyer and Pearson to do so, but the trial court found that plaintiff did present sufficient evidence to support the conspiracy claims.

# I.  ANALYSIS

## A.  BREACH OF FIDUCIARY DUTY

### 1.  DUTY AND BREACH

It has long been the rule in Michigan that directors and officers owe a fiduciary duty to corporations and corporate shareholders.  MCL 750.1541a(1); *Wagner Elec Corp v Hydraulic Brake Co*, 269 Mich 560, 564; 257 NW 884 (1934); *Prod Finishing Corp v Shields*, 158 Mich App 479, 485; 405 NW2d 171 (1987).  The trial court did not clearly err in finding that Linsmeyer was an officer who owed a fiduciary duty to Northwoods.  Linsmeyer was the vice president and general manager of Northwoods and was in charge of running the day-to-day operations of the company.  Defendants have pointed to no authority to support their assertion that corporate records must confirm a corporate officer's title and, therefore, we consider this argument abandoned.  *Mettler Walloon, LLC v Melrose Twp*, 281 Mich App 184, 221; 761 NW2d 293 (2008).

Defendants also argue that no evidence was presented to support the trial court's finding that Pearson was a corporate officer who owed a fiduciary duty to Northwoods.  However, the trial court did not find that Pearson was an officer or director.  Rather, the trial court found that Pearson, as the sales manager for Northwoods, owed the company a fiduciary duty as an agent of the company.  See *Prod Finishing Corp*, 158 Mich App at 486-487.  Defendants do not challenge this finding.

Defendants argue that Northwoods failed to meet its burden of proof to establish that Linsmeyer's and Pearson's breaches of their fiduciary duties caused damages to Northwoods.  First, they simply assert that they "stressed in their closing argument" that there was "no sufficient evidence in the record to support a finding that either Linsmeyer or Pearson caused Northwoods $80,500 in lost profit damages."  Other than citing a nonbinding unpublished decision of this Court recognizing the distinction between the elements of a breach of fiduciary duty claim, and quoting a portion of their closing argument, defendants have failed to provide any analysis or otherwise develop this argument.  "An appellant may not merely announce his position and leave it to this Court to discover and rationalize the basis for his claims."  See *People v Kelly*, 231 Mich App 627, 640-641; 588 NW2d 480 (1998).

### 2.  CAUSATION

Defendants also argue that the trial court erred by awarding Northwoods damages for overpaid labor performed by Niagara Fabrication employees on Northwoods' projects because Northwoods failed to elicit any evidence to rebut Linsmeyer's testimony that Northwoods did not have enough manpower to complete the jobs.  However, as defendants acknowledge, and the trial court found, Northwoods' president testified that Northwoods could have had its own employees do the work.  Additionally, as the trial court found, although Linsmeyer testified that he had the authority to hire additional employees for Northwoods, he instead contracted the business to Niagara Fabrication.  In light of the evidence, the trial court did not clearly err in

finding that Northwoods suffered damages for overpaid labor. *Chapdelane*, 247 Mich App at 169.

Defendants also argue that the trial court erred by finding that Northwoods suffered damages as a result of defendants' failure to inform Northwoods about the opportunity to sell scrap metal from Northwoods' hopper project, and to instead sell the scrap metal for the benefit of Niagara Fabrication. They contend that Northwoods failed to prove that the business opportunity was in line with Northwoods' business or that Northwoods had any connection to the scrap metal. A fiduciary has a duty to notify his or her principal of a business opportunity which the corporation is financially able to undertake, which is, from its nature, in the line of the corporation's business and is of practical advantage to it, and which is one in which the corporation has an interest or a reasonable expectancy. *Prod Finishing Corp*, 158 Mich App at 485-486. Linsmeyer's testimony established the connection between Northwoods and the scrap metal generated from Northwoods' SGI hopper project, and Pipp testified that Northwoods typically sells the scrap that it generates. Even accepting Linsmeyer's testimony that Northwoods was not in the scrap business, the evidence supported a finding that the opportunity to scrap the metal removed from Northwoods' project was in the line of Northwoods' business and that Northwoods would have a reasonable expectation to be offered the business opportunity by its serving vice president and general manager. The trial court's findings were not clearly erroneous.

### 3. DAMAGES

Defendants argue that Northwoods is not entitled to damages for lost profits because (1) the claim is based solely on speculation without any evidentiary support; (2) Northwoods failed to prove alleged necessary contingencies to establish lost profits; (3) Northwoods' expert offered no opinion as to lost revenues; and (4) Northwoods failed to provide evidence of lost profits. We disagree.

In *Health Call of Detroit v Atrium Home & Health Care Servs, Inc,* 268 Mich App 83, 96; 706 NW2d 843 (2005), this Court discussed damage principles:

> The general rule is that remote, contingent, and speculative damages cannot be recovered in Michigan in a tort action. A plaintiff asserting a cause of action has the burden of proving damages with reasonable certainty, and damages predicated on speculation and conjecture are not recoverable. Damages, however, are not speculative simply because they cannot be ascertained with mathematical precision. Although the result may only be an approximation, it is sufficient if a reasonable basis for computation exists. Moreover, the law will not demand that a plaintiff show a higher degree of certainty than the nature of the case permits. [L]ost profits are recoverable as damages on proper proof . . . . [W]hen the nature of a case permits only an estimation of damages or a part of the damages with certainty, it is proper to place before the jury all the facts and circumstances which have a tendency to show their probable amount. Furthermore, the certainty requirement is relaxed where damages have been established but the amount of damages remains an open question. Questions regarding what damages may be

reasonably anticipated are issues better left to the trier of fact. [Internal quotation marks and citations omitted.]

"In order to recover prospective profits, a plaintiff must establish proof of lost profits with a reasonable degree of certainty." *Joerger v Gordon Food Serv, Inc,* 224 Mich App 167, 175; 568 NW2d 365 (1997). "[E]ven if lost profits are difficult to calculate and speculative to some degree, they are still allowed as an item of loss." *Health Call,* 268 Mich App at 104. The type of uncertainty that will bar recovery of damages is "uncertainty as to the fact of damage and not as to its amount." *Bonelli v Volkswagen of America, Inc,* 166 Mich App 483, 511; 421 NW2d 213 (1988).

Defendants first argue that Northwoods' expert relied on speculative lost revenue information provided by Northwoods' president, Thomas Betters, when calculating lost profits. They contend that Betters failed to substantiate the claim that Northwoods lost $2.35 million in revenue during 2012.[2]

Contrary to defendants' assertion, the estimate of lost revenue was not based on speculation and conjecture. Betters testified that he generated historical sales by customer reports from the company's internal accounting system and that the reports contained detailed sales to ITS from January 2010 through November 2013. Betters testified that the industry was quite steady and that Northwoods' performance was steady during this period, except for the drop in sales from the three major customers. He believed that Northwoods' financial performance actually got better, with gross margins up about three percent and fixed expenses remaining the same. Putting aside those three customers, revenues remained about the same. Based on the historical information contained in the reports, Betters calculated lost revenue for all three customers in the amount of $2.35 million. Northwoods' expert used this revenue figure in calculating lost profits.

Defendants also challenge the expert's use of Betters's revenue analysis and contend that the expert should have performed his own revenue analysis. The expert testified that the scope of his work was to review the analysis prepared by Betters and to give his opinion regarding lost profits based on Betters's estimate of lost revenues. The expert did, however, review the analysis provided by Betters and determined the information to be reasonable based on actual financial information obtained from Northwoods' CPA, the history of the company, and industry standards.

In any event, the trial court did not use the expert's calculations and instead made its own calculation of damages for lost profits:

Plaintiff has shown a significant and uncharacteristic loss in sales from I.T.S. in 2012. . . . Plaintiff had total sales from I.T.S. in 2010 of $295,088; $849,142 in 2011; $4,700 in 2012 and $369,441 in 2013. The Court does not find

---

[2] The estimate of lost revenue includes lost sales to plaintiff's three major customers. The trial court awarded lost profit damages only with respect to ITS and, therefore, we focus solely on evidence regarding ITS.

the Plaintiff has proven lost profits attributable to Defendants['] breach of fiduciary duty beyond the end of May 2012.  Between January 2011 and May 2011 Plaintiff had total sales from I.T.S. of $326,703.  In 2012 Plaintiff only had $4,700 in total sales for a difference of $322,003.00.  Accepting Plaintiff[']s expert's testimony as accurate on the industry standard and Plaintiff's historical standard profit margin of 25%, this results in a loss of profits for Plaintiff of $80,500.

Defendants have produced no evidence to contradict plaintiff's evidence on which the trial court based its calculation of lost profits.  Under the circumstances, the lost profits were shown with a reasonable degree of certainty and were not merely speculative.

Defendants next argue that Northwoods failed to present evidence that it would have otherwise earned the lost revenue but for the alleged breach of fiduciary duty.  They contend that Northwoods failed to prove that the work was available and that Northwoods would have been awarded such work but for the actions of defendants.  In support of this contention, defendants rely, without any analysis, on a statement in *Body Rustproofing, Inc v Mich Bell Telephone Co*, 149 Mich App 385, 391; 385 NW2d 797 (1986), that "all the various contingencies by which such [lost] profits would probably be affected should be taken into account by the jury."  Defendants contend that Betters's testimony that he did not inquire whether ITS was issuing orders at the time that Northwoods allegedly lost business, and his acknowledgement that various factors can affect the business that a customer is doing at a given time, required Northwoods to offer evidence that these contingencies were satisfied with respect to its alleged lost profits.

In *Body Rustproofing*, an advertiser sought to recover damages based upon the omission of its advertisements from the yellow pages directories because of an error on the part of the telephone company.  *Id*. at 387.  Both parties submitted evidence on the issue of damages.  The plaintiff introduced evidence of a decline in the plaintiff's profits for the year when the ads were omitted, as compared to the previous year when the ads had been published in the directory, with an adjustment in the decline in profits to account for the decrease in new car registrations in the area that year.  *Id*. at 388-389.  The defendant introduced evidence that the plaintiff's loss of profits was due to the decrease in new car sales and in the increase in the price of the services the plaintiff was selling, and that the plaintiff had not established any loss attributable to the omission of the ads.  *Id*. at 389.  The jury returned a verdict of no cause of action.  *Id*.  On appeal, the plaintiff argued that the trial court erred by giving the defendant's requested jury instruction, the substance of which was as follows:  "To the extent that the plaintiff relies upon prior years of sales compared with the subject year's sales to determine the loss of business or profits, plaintiff must have shown the extent to which the prior year's sales were derived from classified directory advertising."  *Id*.

The *Body Rustproofing* Court held that the instruction was erroneous, reasoning as follows:

> The disputed instruction in this case went to the issue of damages.  The measure of damages for a breach of contract such as the one at bar is that which would place the injured party in as good a position as he would have been in if the promised performance had been rendered.  Lost profits, if properly proven, are an appropriate element of damages.  Before lost profits are recoverable, they must be

-6-

proven with a reasonable degree of certainty as opposed to being based on mere conjecture or speculation.

However, "[t]he law does not require impossibilities" and does not require a higher degree of certainty than the nature of the case permits. Therefore, when the nature of a case permits only an estimation of damages or a part of the damages with certainty, it is proper to place before the jury all the facts and circumstances which have a tendency to show their probable amount. In order for past profits to be safely taken as a measure of future profits, all the various contingencies by which such profits would probably be affected should be taken into account by the jury and allowed such weight as the jury, in the exercise of good sense and sound discretion, believes they are entitled to. [*Id*. at 390-391 (citations omitted).]

Northwoods presented evidence that the industry and the business it was able to generate were steady. Northwoods also established that it could produce the same large ovens for ITS that Niagara Fabrication was producing after Linsmeyer and Pearson left. And evidence of increased sales obtained by Niagara Fabrication from ITS in 2012 showed that ITS work was available. Defendants have not identified any other "contingencies" that Northwoods should have addressed.

Defendants also argue that the trial court erred by relying on the expert's testimony as it pertained only to gross profit instead of net profit. We disagree. "Damages for lost profits must be based on the loss of net, rather than gross, profits." *Getman v Mathews*, 125 Mich App 245, 250; 335 NW2d 671 (1983). Here, the expert testified that Northwoods' historical net profits were akin to its gross profits because the company did not have a lot of "below the line" expenses. Defendants have failed to demonstrate that the trial court clearly erred by relying on the expert's historical profit percentages in calculating net lost profits. *Chapdelane*, 247 Mich App at 169.

## B. CONVERSION

Defendants argue that the trial court erred by finding that $5,000 of Northwoods' funds given by Pearson to Craig Nushart was not repaid to Northwoods because Linsmeyer testified that the money was repaid to Northwoods via a credit in a Miron Construction purchase order. However, Linsmeyer's testimony was stricken by the trial court for lack of foundation, and defendants presented no other evidence regarding the alleged credit in a purchase order. Betters testified that his review of Northwoods' financial records produced no evidence that the $5,000 had ever been repaid. The trial court did not clearly err in finding that Northwoods presented adequate evidence that the money was not repaid. *Id*.

Defendants also argue that the trial court erred by awarding damages for a truck pull that was purchased by Linsmeyer using a Northwoods' credit card and was given to Mike Derr, an employee of Metso Minerals, because Pipp testified that Linsmeyer had authority and discretion to make the purchase and that the purchase was for the benefit of Northwoods. However, Pipp's testimony established that Linsmeyer's authority to spend was limited and that he viewed Linsmeyer's purchase of a $4,800 truck pull as a gift for Derr as unapproved and unethical. Further, Linsmeyer's testimony that Niagara Fabrication was given approximately $600,000 of

work from Metso Minerals after Linsmeyer left Northwoods, whereas Northwoods' sales to Metso Minerals dropped from $530,209 in 2011, to $97,353 in 2012, and to zero in 2013, suggests that it was Niagara Fabrication and not Northwoods that benefited from giving the truck pull to Derr. Given this evidence, the trial court did not clearly err in finding that Linsmeyer wrongfully used Northwoods' funds to purchase the truck pull without Northwoods' consent and for the benefit of Niagara. *Id*.

In light of our conclusion that the trial court did not err in its award of damages for conversion, we need not address defendants' argument that the treble damages must be reversed as defendants' argument assumes a reversal of the trial court's decision with respect to these damages.

Affirmed.

/s/ Elizabeth L. Gleicher
/s/ David H. Sawyer
/s/ Michael J. Kelly